## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KENDRICK WILLIAMS**                           **CIVIL ACTION**

**versus**                                                    **NO. 09-6433**

**N. BURL CAIN, WARDEN, LSP**                **SECTION: I**

### ORDER AND REASONS

Before the Court is a petition for *habeas corpus* filed by Kendrick Williams.  The state has filed a response.   Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, the petition is **DISMISSED WITH PREJUDICE**.

Petitioner, Kendrick Williams, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On July 22, 2004, he was convicted under state law of second degree murder. State v. Condley, 904 So. 2d 881, 884 (La. Ct. App. 2005).  On September 3, 2004, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Id.  On May 31, 2005, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence. Id.  The Louisiana Supreme Court then denied petitioner's related writ application on February 10, 2006. State v. Condley, 924 So. 2d 163 (La. 2006).

After seeking and being denied post-conviction relief in the state courts, petitioner filed the instant application for *habeas corpus* relief.[1]  In support of his application, he asserts the following claims:

1.      There was insufficient evidence to support petitioner's conviction;

2.      Petitioner received ineffective assistance of counsel at trial and on appeal;

3.      The state knowingly elicited perjured testimony from its witnesses in violation of defendant's due process rights.

The state concedes that petitioner has exhausted his state court remedies with respect to these claims, but it argues that petitioner's application is untimely and that petitioner's third claim has been procedurally defaulted.[2]

<u>Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

---

[1]R. Doc. No. 1.

[2]R. Doc. No. 11, pp.2-3.

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the U.S. Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme

> Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S. Ct. 294 (2010).

Regarding the "unreasonable application" clause, the Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; see also Puckett v. Epps, No. 09-70032, 2011 WL 1891207, at *5 (5th Cir. May 19, 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

<u>Facts</u>

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> Joseph Washington, an eyewitness, testified that on September 8, 2003, between 8:30 and 9:30 p.m., he was coming from his friend's house on Rotunda Street in Avondale and going home. As he walked up Rotunda and turned onto Senate Street, he noticed that Eric Deverney, whom he knew as "Tiptoe", was being beaten in a side yard by two men whom he later identified as defendants, Williams and Condley.
>
> Washington observed Williams hitting Deverney hard all over his body with a post-hole digger and Condley hitting Deverney with a two-by-four. He explained that Williams then dropped the post hole digger and started hitting Deverney with a bat. Washington heard Deverney screaming, "[p]lease stop. Stop. All right. I'm sorry. I'm sorry." Washington watched the beating for three or four minutes until Williams came down to the curb where he was standing and told him, "[g]et the f ... from around here before something happens to you."
>
> After that, Washington heard Williams tell Condley, "[g]o get the gauge", which Washington assumed meant a 12-gauge shotgun.

At that point, Washington walked off, went down the street to the corner of Senate and Delegate Streets, hid behind a tree so defendants would not see him, and finished watching. Washington heard Deverney hollering and then observed defendants back up a white Pontiac or Grand Prix in the driveway and put Deverney's body into the trunk along with the post-hole digger, bat, and another shovel.

Afterwards, Washington saw defendants wash down the driveway. Washington left and walked around the corner back to his friend's house to ask him to take him to a telephone so he could call the police. Washington's friend subsequently took him to the Circle K where Washington dialed 911 and reported the incident.

After Washington and his friend left the Circle K, they went down Avondale Garden Road and then down a street near River Road. As they did so, Washington saw the white Pontiac coming across the train tracks with the trunk flopping up and down. Washington assumed that defendants had dropped the body off behind the levee. When defendants returned to the house, Washington saw them finish washing down the driveway. Washington testified that the police came to the scene, but did not do anything. Therefore, he called the police again and gave his name and told them what happened. Washington later positively identified Williams in a photographic lineup.

Lori Rimmer, an eyewitness, testified that on September 8, 2003 between 8:30 and 9:30 p.m., as she was walking up Senate Street towards Delegate to go visit a friend, she observed Deverney walk down the street to Williams' house. Rimmer then heard a verbal confrontation and saw Williams hit Deverney in the back with a shovel. Rimmer testified that as Deverney was hollering and screaming for his life and trying to get up, Condley hit Deverney with a hammer which knocked Deverney back down.

Rimmer observed both Williams and Condley stomp Deverney. She explained that a group of people present at the scene subsequently made a circle around defendants and Deverney, so she could not see any more of what was going on. After the beating, Rimmer observed defendants put the body into plastic, wrap it up tightly, and put the body inside the trunk of a white Grand Am which they had backed up to the garage area. Rimmer explained that they had to slam the trunk several times to get it to close. During the event, Rimmer saw Ricky Cowart standing by the fence near the driveway. Rimmer stayed out there until approximately 10:00 p.m. She saw the police come, but she did not talk to them because she was scared.

At some point after this incident occurred, Williams stopped her as she was walking and asked her if she knew anything about a murder. Rimmer told Williams she did not know what he was talking about. Rimmer later positively identified Williams and Condley in photographic lineups and in court.

Ricky Cowart, an eyewitness, testified that on the evening of September 8, 2003, he and Deverney, a lifelong friend, intended to go and purchase drugs from Williams, whom he called "Black". Cowart explained that he was waiting for some money "to go half on some drugs", but that Deverney did not want to wait. Deverney then left, telling Cowart, "I'm gonna take care of my business." After Cowart got the money, he walked down to Williams' house, which was one house down from where Cowart was, to see what was going on.

As Cowart walked down alongside the fence, he saw Condley hit Deverney twice. He then observed a bunch of people pile onto Deverney and start beating him. Cowart also saw Williams hit Deverney from the back. He testified that Condley may have hit Deverney with a two-by-four, but he was not sure, and that Williams hit Deverney with a "pole digger."

Cowart eased back around to the other side of the house. He then observed defendants back up a white Pontiac in the driveway and put Deverney into the trunk. Coward heard the trunk slam several times and saw the vehicle leave and stay gone for a few minutes. He assumed they were going to take the body somewhere and dump it. When defendants finished with what they were doing, they came back to the scene. Cowart then observed 11 or 12 men get into the white Pontiac and a green car and leave.

The next morning, Cowart was on his way to the store when Williams called him over. When Cowart walked over there, he noticed defendants were putting bleach on the ground to clean up what they had done the night before. Cowart noted that defendants had also hosed down the driveway the night before. Williams asked Cowart if he had heard anything, and Cowart said he had not. Later on, Cowart went to the detective bureau to inform them of the incident. Cowart positively identified Williams and Condley in photographic lineups.

JPSO Det. David Morales testified that on September 11, 2003, Deverney's body was found in the 7200 block of River Road, 95 feet from the base of the levee near some weeds. He further testified that a piece of blue plastic was found on the ground five feet from the victim's head. Morales explained that the plastic was part of a lower trunk trim section of a General Motors vehicle, and that the

part number on the plastic indicated it belonged to a 1999 Pontiac Grand Am. He showed photographic lineups to the eyewitnesses who positively identified defendants. Morales spoke to Williams who told him that on September 6, 2003 he had taken a 10:00 p.m. Southwest Airlines flight to Houston.

Dr. Karen Ross, a forensic pathologist and assistant coroner with the Jefferson Parish Coroner's Office and a stipulated expert in the field of forensic pathology, testified that she conducted an autopsy on Deverney. Her physical examination revealed that Deverney's body was decomposing, and that it had multiple blunt force injuries, multiple lacerations of the scalp with a skull fracture on the left side of the head, and lacerations on the upper part of the chest and on both of the arms and lower back. In her report, Dr. Ross stated that it was her opinion that Deverney died as a result of multiple blunt force injuries, and that the manner of death was homicide.

After the state rested, the defense called Crisceda Martin Williams, Williams' wife, as a witness. Mrs. Williams testified that on September 6, 2003, at approximately 11:15 p.m., she and her friend, Lawrence Rogers, picked up Williams from a Houston airport. She explained that she and Williams had decided to reunite after being separated since March of 2003, and that Williams had come to Houston to pick up her and their children and bring them back home to Avondale.

Mrs. Williams testified that she, Williams, and their children spent the night of September 6, 2003 in Houston, and that on September 7, 2003, they went to church with a friend, picked up a layaway item from Wal-Mart, and spent that night with friends. Mrs. Williams explained that on September 8, 2003, she and Williams went to their children's school in Houston and checked them out, went back to their friends' house, and then went to McDonalds at approximately 5:00 p.m. After they ate at McDonalds, they headed home to New Orleans making two stops along the way.

Mrs. Williams testified that Williams was with them all day on September 8, 2003, that she was not sure when they got home, that it was dark when they got home, that they did not get home before midnight, and that they did not get home until the next day, September 9, 2003.

Lawrence Rogers testified at trial, and his testimony largely corroborated that of Mrs. Williams. Additionally, Rogers testified that he saw Williams on September 8, 2003 at approximately 5:00 p.m. at McDonalds, that Williams left McDonalds and headed for

New Orleans between 5:15 and 6:00 p.m., and that he did not see Williams again after that.

Defendant, Kendrick Williams, Condley's brother, testified at trial, and his testimony largely corroborated that of Mrs. Williams and Rogers. Additionally, Williams testified that he was not in Avondale on September 8, 2003 at 9:00 p.m., and that he did not know Deverney and never beat or hit or killed him. Williams recalled telling the police that he got home at 10:00 p.m., but said that he was not paying attention to what he was saying. He claimed he did not get home from Houston until Tuesday morning, September 9, 2003. Williams explained that he had previously called the police to lodge a complaint against Cowart for purchasing drugs in front of his house while his children were outside and suggested that Cowart had testified against him in retaliation.

The state called Lisa Stewart as a rebuttal witness. Stewart, Custodian of Records for Southwest Airlines, testified that there was no ticket issued to Kendrick Williams on September 6, 2003 leaving at 10:00 or 10:15 p.m. from New Orleans to Houston. On cross-examination, she testified that a ticket was issued in the name of "Willie Williams" on that date.

<u>Condley</u>, 904 So. 2d at 884-87.

<u>Timeliness</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[3]

The Louisiana Supreme Court denied petitioner's writ application on direct review on February 10, 2006, and thereafter denied reconsideration on September 1, 2006.  Therefore, under

---

[3]Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

§ 2244(d)(1)(A), his conviction and sentence became "final" on November 30, 2006, when the period for seeking a writ of certiorari from the United States Supreme Court expired. See Wilson v. Cain, 564 F.3d 702 (5th Cir. 2009); see also U.S. Sup. Ct. R. 13. Accordingly, his period for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless that deadline was extended through tolling.

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). After ninety-six (96) days elapsed, petitioner tolled the federal limitations period on March 7, 2007, by filing a post-conviction application with the state district court. The state concedes that tolling then continued uninterrupted for the duration of the post-conviction proceedings.[4] See also Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004). Therefore, the Court finds that tolling continued until the Louisiana Supreme Court denied relief on June 20, 2008.[5]

At that point, petitioner had two hundred sixty-nine (269) days of the federal limitations period remaining. Accordingly, his federal application had to be filed by March 16, 2009, in order to be timely.

---

[4]R. Doc. No. 11, p.10.

[5]A petitioner receives no additional tolling credit for the period during which he could have sought review by the U.S. Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

The state disputes whether petitioner "filed" his federal application by that deadline. However, it is clear that "[a] prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner signed his petition on August 20, 2008.[6] Absent evidence to the contrary, this Court generally assumes that a prisoner delivered a petition to prison officials for mailing on the date of signing. See, e.g., Molliere v. Louisiana, No. 08-3748, 2010 WL 891002, at *1 n.2 (E.D. La. Mar. 5, 2010); Colarte v. Leblanc, 40 F. Supp.2d 816, 817 (E.D. La. 1999). Therefore, this Court would normally consider petitioner's federal application to have been "filed" on August 20, 2008, a date well before the limitations period expired.

The state argues that petitioner's application should not be considered "filed" as of that date because it was originally tendered to the Court for filing unaccompanied by either the required filing fee or an application to proceed *in forma pauperis* as required by Rule 3(a) of the Rules Governing Section 2254 Cases in the United States District Courts. Instead, the state contends that the application should not be considered "filed" until petitioner cured that defect by filing a pauper application in September, 2009, several months after the federal limitations period expired.

In support of its argument, the state cites Boudreaux v. Cain, No. 07-1041, 2009 WL 4730706 (E.D. La. Dec. 9, 2009). In that case, United States Magistrate Judge Louis Moore, Jr., in a report and recommendation subsequently adopted by United States District Judge Martin C. Feldman, opined that noncompliance with Rule 3 could perhaps affect the "filing" date of a federal *habeas corpus* petition. Id. at *5-7. However, even Magistrate Judge Moore has since retreated

---

[6]The application was received by this Court on August 25, 2008.

from that position in the later case of <u>Carter v. Cain</u>, No. 09-2551, 2011 WL 798907, at *2 (E.D. La. Feb. 10, 2011) (Moore, M.J.), <u>adopted</u>, 2011 WL 794673 (E.D. La. Feb. 28, 2011) (Zainey, J.).

     This Court finds that <u>Carter</u> is a more accurate application of the law.  As the U.S. Fifth Circuit Court of Appeals explained in an earlier case:

> Although Rule 3(a) of the Rules Governing Section 2254 Cases in the District Courts states that a petition must be accompanied by the filing fee, the Advisory Committee notes for the 2004 amendments to Rule 3(b) state that "the clerk would also be required, for example, to file the petition even though it lacked the requisite filing fee or an *in forma pauperis* form."  Similarly, our court has stated that the mailbox rule "constitutes an exception" to Rule 3's requirements; thus a pro se prisoner...need not mail his fee with his petition in order for it be treated as filed.

<u>Medley v. Thaler</u>, No. 08-11009, 2010 WL 4459836, at *4 (5th Cir. Nov. 9, 2010).  The Fifth Circuit also noted:  "Further, the Third and Seventh Circuits have interpreted Rule 3(a) to mean that its requirement that the fee accompany the petition should only be understood as a demand that the fee or IFP application follow within a reasonable time after the petition."  <u>Id</u>. at *4 n.2 (internal quotation marks omitted).  Accordingly, this Court finds that petitioner's original noncompliance with Rule 3 is insufficient to render his federal application untimely.

     In light of the foregoing, this Court rejects the state's argument and finds that petitioner's federal application should be deemed "filed" as of August 20, 2008.  It is, therefore, timely and the state's position is rejected.

<u>Sufficiency of the Evidence</u>

     Petitioner first claims that there was insufficient evidence to support his conviction. On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

–  12  –

The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.

In the instant case, defendants were convicted of second degree murder. To prove second degree murder, the state must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La. App. 5 Cir. 10/19/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.

In addition to proving the statutory elements of the charged offense at trial, the state is required to prove the identity of the perpetrator. Where the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Vasquez, 98-898 (La. App. 5 Cir. 2/10/99), 729 So.2d 65, 69.

In the instant case, defendants are correct that there were inconsistencies among the three witnesses regarding the number of people present during the beating, the type and number of weapons used, and whether the witnesses saw one another at the time of the beating, among other things. However, the witnesses were consistent on the most relevant aspects of the case, i.e., they all witnessed defendants beating the victim with objects on September 8, 2003 between 8:30 and 9:30 p.m., placing the body in the trunk of a white Pontiac or Grand Am, and driving away. Additionally, Washington testified that he observed a white Pontiac with its trunk flopping up and down returning from an area near River Road, and Det. Morales testified that a piece of plastic from a 1999 Pontiac Grand Am was found on the ground near the victim's body which was discovered in the 7200 block of River Road.

Although defendant Williams claimed to be on his way home from Houston at the time of the incident, the jury apparently rejected this testimony and found the state's witnesses to be more credible. It is the role of the fact-finder to weigh the respective credibilities of the

> witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983).
>
> Viewing the evidence in this case in the light most favorable to the prosecution, we find that the jury could have found beyond a reasonable doubt that defendants committed second degree murder.

Condley, 904 So. 2d at 898-90.  The Louisiana Supreme Court then denied petitioner's related writ application. Condley, 924 So. 2d 163.

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing.

Under federal law, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).

– 14 –

Moreover, Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings.  In these proceedings, *only* the <u>Jackson</u> standard need be satisfied, even if state law would impose a more demanding standard of proof.  <u>Williams v. Cain</u>, 408 Fed. App'x 817, 821 (5th Cir. 2011); <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

Further, the Court cannot accept petitioner's invitation to reassess the credibility of the various witnesses.  Such credibility determinations are the province of the jury at trial, not this Court on collateral review.  <u>See</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) ("[U]nder <u>Jackson [v. Virginia</u>, 443 U.S. 307 (1979)], the assessment of the credibility of witnesses is generally beyond the scope of review."); <u>Ramirez v. Dretke</u>, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); <u>McCowin v. Scott</u>, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the <u>Jackson</u> standard for habeas relief."); <u>Picou v. Cain</u>, No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

With those strict principles of review in mind, this Court finds that, for the reasons noted by the state court, the evidence presented in the instant case, when viewed in the light most favorable to the prosecution, was clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt.  Therefore, petitioner cannot show that the state court's decision rejecting his insufficiency of the evidence claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, this Court should defer to the state court's decision rejecting that claim.

<u>Ineffective Assistance of Counsel</u>

Petitioner next claims that he received ineffective assistance of counsel.  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).  Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see</u> <u>also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong of the <u>Strickland</u> test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  <u>See</u> <u>Crockett v.</u>

McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner's ineffective assistance of counsel claim was rejected by the state courts in the post-conviction proceedings.[7] Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the U.S. Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether

---

[7]The state district court denied this claim on June 20, 2007. State Rec., Vol. 2 of 7, Tab 4. Petitioner's related writ application was then likewise denied by the Louisiana Fifth Circuit Court of Appeal. Williams v. Cain, No. 2007-KH-610 (La. App. 5th Cir. Aug. 30, 2007) (unpublished); State Rec., Vol. 7 of 7, Tab 11. The Louisiana Supreme Court also denied relief. State *ex rel.* Williams v. State, No. 2007-KH-1943; State Rec., Vol. 7 of 7, Tab 12.

defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. 770, 785-86 (2011) (citation omitted). The Supreme

Court then explained:

Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the

– 18 –

right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claim.

Petitioner first contends that his trial counsel was ineffective for failing to suppress the out-of-court identifications made by the witnesses called to testify at trial and failing to object to the in-court identifications made by those witnesses.   Specifically, petitioner argues that the inconsistencies that existed between the witnesses' trial testimony and their prior statements as well as between the trial testimony of individual witnesses rendered their testimony unreliable.  Petitioner

further argues that his counsel should have moved to prevent any elicitation of testimony from the state's witnesses because their accounts of the events at issue were unreliable.

The premise underlying petitioner's argument is erroneous. The fact that one witness's trial testimony is inconsistent with a prior statement or another witness's testimony addresses the credibility and weight to be given the testimony and, as previously stated, such credibility determinations are the province of the jury at trial. See Schlup, 513 U.S. at 330. Contrary to petitioner's assertion, such fact does not render that witness's testimony inadmissible. See Lindsey v. Cain, No. 05-1593, 2009 WL 1575466, at *14 (E.D. La. May 29, 2009) ("The State essentially presented two conflicting versions of the incident to the jury. It was within the province of the jury to resolve the disputed testimony."). Even if petitioner's counsel had sought to exclude inconsistent testimony as petitioner claims counsel should have, such effort would have been futile as factual inconsistency is not a legal basis to exclude testimony.

A determination of ineffectiveness "depends on whether either a suppression motion or an objection would have been granted or sustained had it been made." U.S. v. Oakley, 827 F.2d 1023, 1025 (5th Cir. 1987). Accordingly, since a suppression motion or objection based on petitioner's rationale would not have been granted or sustained, counsel was not ineffective. Furthermore, because counsel was not ineffective, the state court's application of Strickland in denying petitioner post-conviction relief was not unreasonable.[8]

---

[8]In ruling on petitioner's application for post-conviction relief, the state district court found that:

> At trial, the defense attorney conducted a thorough cross-examination of the state witnesses. Counsel brought to light any inconsistencies between the witnesses [sic] statement's [sic] to the

Petitioner next claims that he received ineffective assistance of counsel because his counsel failed to object to the prosecution's use of perjured testimony.  Petitioner's argument is based on his assertion that because there were inconsistencies in the testimonies of the state's witnesses, the prosecution elicited perjured testimony.  However, petitioner's argument is just a reiteration of his previous claim that his counsel should have objected to the introduction of inconsistent testimony.  No matter how petitioner seeks to characterize the inconsistent testimony introduced during his prosecution, the testimony was admissible.  Accordingly, his counsel was not ineffective for failing to object to the introduction of admissible evidence.  Furthermore, because his counsel was not ineffective, the state court's application of Strickland in denying petitioner post-conviction relief was not unreasonable.

In his third claim of ineffective assistance of counsel, petitioner alleges that the trial court gave a defective charge as to the law of principals and that the prosecutor also made a misstatement on the law as to this point.  In particular, petitioner asserts that the trial court failed to instruct the jury that the petitioner had to have the specific intent to kill in order to be found guilty of second degree murder.  Petitioner claims that his counsel was ineffective for failing to object at trial and failing to raise the issue on appeal.

_____

police and their in-court testimony.  It was the duty of counsel to challenge the state's case.  It was not the duty of counsel to make frivolous or unwarranted objections.  Trial counsel used effective advocacy skills in examining witnesses and in making an argument to the jury.

State Rec., Vol. 2 of 7, Tab 4.

The Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. Sandstrom v. Montana, 442 U.S. 510, 520 (1979).  The mere fact of an erroneous instruction to the jury, however, relative to the elements of the crime charged under state law, is not a basis for federal habeas relief. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  Instead, the Court must focus on "whether the ailing instruction by itself so infected the entire trial process that the resulting conviction violates due process." Id.  In examining the challenged instruction, the Court does not look at it in "artificial isolation," but must consider it in the "context of the instructions as a whole and the trial record." Id.  Finally, when there is a question as to whether a jury instruction is ambiguous and violates due process by relieving the State of the burden of proof of an element of a crime, the question before the Court is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id. Accord, Flowers v. Blackburn, 779 F.2d 1115 (5th Cir.), cert. denied, 475 U.S. 1132 (1986).  The applicable test is whether the instruction "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In addressing the substance of petitioner's claim, the Louisiana Fifth Circuit Court of Appeal stated:

> Defendant Williams argues in his *pro se* brief that the trial court erred in giving a defective charge on principals to the jury, and that the defense erred by not lodging an objection. He contends that the trial judge failed to charge the jury that in order to convict him of second degree murder, it must find that he had the specific intent to kill. He also contends that his trial counsel was ineffective for failing to object to the alleged error, and that his appellate counsel was ineffective for failing to assign and brief the alleged error.

> The record reflects that the trial judge did in fact charge the
> jury that in order to convict defendants of second degree murder, it
> must find that defendants acted with a specific intent to kill or to
> inflict great bodily harm. This charge was read to the jury almost
> immediately after the charge on principals. Additionally, the trial
> judge also provided the jury with the definition of specific intent.
>
> In light of the foregoing, we find that the trial court did not err
> in giving an erroneous charge to the jury. Additionally, because the
> record shows that the jury instruction was proper, there was no basis
> for an objection by trial counsel. Thus, defendant's allegation
> regarding ineffective assistance of counsel has no merit.

Condley, 904 So. 2d at 894-95.

The conclusion of the Louisiana Fifth Circuit Court of Appeal is plainly supported

by the trial court's instructions.  The trial court explained specific criminal intent and then defined

second degree murder as "the killing of a human being, when the offender has a specific intent to

kill or to inflict bodily harm."[9]  The court further iterated that "in order to convict the defendants of

second degree murder, you must find: 1. That the defendants killed Eric Deverney; and 2. That the

defendants acted with a specific intent to kill or to inflict great bodily harm."[10]  The court then

instructed the jury that manslaughter and not guilty were responsive verdicts and explained the

elements of manslaughter.[11]  The court also emphasized that, "the defendants are entitled to their

separate verdicts, so we have two lists of responsive verdicts, one for Frederick Condley, and one

for Kendrick Williams."[12]  Following an inquiry from the jury, the court repeated the elements of

---

[9]State Rec., Vol. 6 of 7, p.506.

[10]Id.

[11]Id. at pp.507-08.

[12]Id. at p.509.

second degree murder and manslaughter.  The court reiterated that second degree murder requires

a specific intent to kill or to inflict great bodily harm and that to convict the defendants, the jury had

to find that the defendants had acted with that specific intent.[13]

The instruction, read as a whole, requires the jury to find specific intent in order to

convict the petitioner of second degree murder.  See e.g., Kimble v. Cain, No. 07-0396, 2010 WL

2925804, at *10 (M.D. La. Jun. 25, 2010).  "This is not a case such as Flowers v. Blackburn, supra,

. . . where reversal of the convictions was warranted when the jury was not instructed as to the need

to find specific intent on the part of each defendant but was instead instructed that, as to principals,

a defendant's mere presence at the scene of the crime, while knowing the specific intent of another

offender to commit the crime, was sufficient for a finding of guilt and made the defendant an 'equal

offender.'  See also Robertson v. Cain, 324 F.3d 297 (5th Cir. 2003)."  Kimble, 2010 WL 2925804,

at *10.  Contrary to petitioner's assertion, the trial court instructed the jury that in order to convict

petitioner of second degree murder, a finding of specific intent was required.[14]  There was, therefore,

no basis for petitioner's counsel to enter an objection.  Counsel's failure to make a frivolous or

baseless objection is not deficient performance below an objective level of reasonableness.  Green

v. Johnson, 160 F.3d 1029, 1037 (5th Cir. 1998).  Accordingly, the state court's finding that

---

[13]Id. at pp.510-11.

[14]Since juries are presumed to follow the court's instructions, Gillespie v. Wilkinson, No. 08-1675, 2010 WL 5373931, at *5 (E.D. La. Nov. 22, 2010) (citing U.S. v. Bullock, 71 F.3d 171, 175 (5th Cir. 1995)), and the court instructed the jury that it was their duty to follow the law as given by the court (State Rec., Vol. 6 of 7, p.505), this Court does not address whether the prosecutor's statement pertaining to the law of the case was correct.

petitioner had not received ineffective assistance of counsel was not an unreasonable application of Strickland.

Petitioner also alleges that his appellate counsel was ineffective for failing to raise the issue of the allegedly faulty jury instructions on appeal.  As set forth above, under Strickland, supra, a petitioner, for purposes of proving ineffective assistance of counsel, must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  This same two-prong test must be satisfied in order to prove ineffectiveness of appellate counsel. See Busby v. Dretke, 359 F.3d 708, 714 (5th Cir.), cert. denied, 541 U.S. 1087 (2004) (citations omitted) ("The familiar Strickland framework applies to a prisoner's claim that his appellate counsel was ineffective for failing to raise a certain issue on appeal.").  In Smith v. Robbins, 528 U.S. 259, 288, (2000) (citation omitted), the U.S. Supreme Court held that appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  In order to prove that counsel was unconstitutionally ineffective in failing to raise particular claims, a petitioner must show "that the appeal would have had, with reasonable probability, a different outcome" if counsel had raised the requested claims. U.S. v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).

The Court finds that it is not reasonably probable that petitioner's appeal would have had a different outcome if appellate counsel had raised the claim that the jury instructions were faulty.  Notwithstanding the fact that for the aforementioned reasons the jury instructions were not improper, petitioner did not suffer any prejudice due to his counsel's alleged failure because the Louisiana Fifth Circuit Court of Appeal still substantively addressed the issue.

For all of these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claims.

<u>Elicitation of Perjured Testimony</u>

Petitioner's final claim is that the state offered false testimony at his trial and allowed it to remain uncorrected.  In its response, the state argues that petitioner's claim is procedurally defaulted.  The state points to the opinion issued by the Louisiana Fifth Circuit Court of Appeal where the court held that, "[w]e considered and rejected the claim in <u>State v. Condley</u>, 04-1349 (La. App. 5th Cir. 5/31/05) 904 So.2d 881, writ den., 05-1760 (La. 2/10/06), 924 So.2d 163. Consequently, under La.C.Cr.P. art. 930.4A [sic],[15] he is procedurally barred from reconsideration of the issue."[16]

The U.S. Supreme Court has noted that when a "state decision rests upon a prohibition against further state review," the decision  is not based on a procedural default and "its effect upon the availability of federal habeas is nil."  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804 n.3, 111 S.Ct. 2590, 2595 n.3, 115 L.Ed.2d 706 (1991) (emphasis in original).  Based upon <u>Ylst</u>, the Fifth

---

[15]Article 930.4(A) states that "[u]nless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered." La.C.Cr.P. art 930.4(A).

[16]State Rec., Vol. 7 of 7, Tab 11 (footnote added).

Circuit has held that a claim defaulted in state court pursuant to La.C.Cr.P. art. 930.4(A) is not procedurally barred in a federal habeas corpus proceeding, noting:

> Article 930.4(A) [of the Louisiana Code of Criminal Procedure] precludes a Louisiana court from considering the merits of a claim that has already been raised on direct appeal. The bar imposed by article 930.4(A) is not a procedural bar in the traditional sense, nor is it a decision on the merits.

Bennett v. Whitley, 41 F.3d 1581, 1583 (5th Cir. 1994). Accordingly, the Court proceeds to the merits of petitioner's claim. Blackwell v. Cain, No. 09-7704, 2010 WL 3943555, at *5 (E.D. La. Aug. 16, 2010).

The U.S. Supreme Court has held that a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. Napue v. Illinois, 360 U.S. 264, 269 (1959); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir.), cert. denied, 519 U.S. 995 (1996). "Granting a new trial on the basis of a Napue violation is only proper if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material." Lindsey, 2009 WL 1575466, at *14 (citing U.S. v. O'Keefe, 128 F.3d 885, 893-94 (5th Cir. 1997)). Further,

> The law is clear that, in order to establish that habeas corpus relief is appropriate because of the perjury of a witness, the party seeking such relief has a two-fold burden. First, petitioner must prove that, indeed, perjury was committed and that the perjured testimony was material to his conviction. Second, and of equal importance, the petitioner must prove that the state knowingly used the alleged perjured testimony. . . . Mere conclusory statements do not raise a constitutional issue in a habeas case.

Lindsey, 2009 WL 1575466, at *14 (citations omitted).

In this case, petitioner asserts nothing beyond the presence of inconsistencies to indicate that the prosecutor in this case knowingly elicited perjured testimony.  The Court notes that "[m]ere inconsistencies in testimony by government witnesses does not establish the government's knowing use of false testimony." <u>Lindsey</u>, 2009 WL 1575466, at *14 (quoting <u>Overton v. U.S.</u>, 450 F.2d 919 (5th Cir. 1971)); <u>see also</u> <u>Shilling v. Cain</u>, 82 F.3d 414, No. 95-30431, 1996 WL 167076, at *6 (5th Cir. Mar. 11, 1996) (finding that inconsistencies between a police report and the witness's testimony does not amount to knowing elicitation of perjured evidence in the absence of facts indicating that the prosecutor knew that the testimony was perjured).  Accordingly, the Court finds that petitioner is not entitled to relief.

<u>Conclusion</u>

For the foregoing reasons,

**IT IS ORDERED** that the petition for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this July __8th__, 2011.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

– 28 –